## WESTERN BATTERY & SUPPLY CO. v. HAZELETT STORAGE BATTERY CO.

### SAME v. WEBSTER.
#### Nos. 9447, 9448.

Circuit Court of Appeals, Eighth Circuit.
Aug. 10, 1932.

Rehearing Denied Sept. 30, 1932.

Carle Whitehead, of Denver, Colo. (Henry S. Conrad, of Kansas City, Mo., and Malcolm Lindsey, D. K. Wolfe, Jr., and Whitehead & Vogl, all of Denver, Colo., on the brief), for appellant.

Hadley F. Freeman, of Cleveland, Ohio (Harry S. Weidman, of Cleveland, Ohio, George M. Albrecht, of Milwaukee, Wis., and Lynn Webb and McCune, Caldwell & Downing, all of Kansas City, Mo., on the brief), for appellees.

Before STONE, KENYON, and VAN VALKENBURGH, Circuit Judges.

KENYON, Circuit Judge.

Appellees (herein at times called plaintiffs) brought their respective suits in the District Court of the United States for the Western District of Missouri to restrain appellant (henceforth frequently called defendant) from further infringement of cer-

tain letters patent held by plaintiffs, and to obtain an accounting for past infringement. Defendant did not question the validity of the patents sued on, and admitted the doing of acts which, unless authorized, would constitute infringement; but pleaded license and estoppel as affirmative defenses. The two cases were consolidated for trial and we consider both in this opinion.

The only evidence before the District Court was that taken by defendant in support of its affirmative defenses. On the basis thereof the District Court made findings of fact and conclusions of law in favor of plaintiffs; and by its decrees enjoined defendant from further infringement, and ordered an accounting before a master.

The findings of fact made by the District Court were not made with reference to any dispute in the evidence, and were less expressive of primary fact than of conclusions of ultimate fact or of law. Hence they are in no way binding upon this court. Uihlein et al. v. General Electric Co. et al. (C. C. A.) 47 F.(2d) 997, 1001.

The facts are rather involved, and a somewhat extended statement thereof seems necessary. Prior to February 26, 1923, the Hazelett Storage Battery Company, an Ohio corporation doing business at Cleveland, Ohio, was the legal and beneficial owner of all the rights embodied in the applications for the nine patents, since matured, which form the basis of the present suits. Said patents all relate to a process for the manufacture of plates for storage batteries, and are the invention of C. W. Hazelett, president of the Hazelett Storage Battery Company. Three formed the basis of the suit by the Hazelett Storage Battery Company and six the basis of the suit by Webster.

In February, 1923, the Hazelett Storage Battery Company was in some financial difficulties. It was indebted as follows:

To George J. Feiss..................$1,500
To McConnell Shank................ 1,500
To L. J. Wolf..................... 1,500
To C. W. Hazelett.................. 2,100
To S. J. Hazelett.................. 500

Total ......................$7,100

With the exception of S. J. Hazelett, the above-named creditors were all directors in the Hazelett Storage Battery Company at the time. Through later events subsequently to appear, Feiss and Wolf seem to have ceased to be directors, and to have been replaced by "dummy" directors, to wit, Helen

Lichtenberg, stenographer for Hazelett Storage Battery Company and Hazelett Manufacturing Company, and one R. A. Richter. S. J. Hazelett likewise later became a director, but gave complete power of attorney in the matter to his brother C. W. Hazelett. Control of the company thus gravitated completely into the hands of Shank, the two Hazeletts, and one H. L. Sherman.

To secure this indebtedness the Hazelett Storage Battery Company on February 26, 1923, assigned to the Cleveland Trust Company of Cleveland, Ohio, as trustee, its entire interest in certain patents and applications for patents, including the applications that have since matured into the six patents, which form the basis of the Webster suit. The nature of the trust, and the duties of the Cleveland Trust Company, were thus determined in the instrument of assignment:

"The trust Company will hold the title to said applications and patents to be granted thereon until the sums mentioned, with interest thereon, have been paid and thereupon will reassign such applications or patents to The Battery Company provided said payments are made within two years from the date hereof.

"If said debts are not fully paid within two years from date hereof, or if The Battery Company or any Company hereafter formed by it, shall become insolvent before two years from date hereof, The Trust Company shall, at the request of the Loaners, or any of them, sell said applications and the patents granted or to be granted thereon subject to the prior contracts mentioned, at the best price obtainable at private or public sale, as directed by The Battery Company, and shall convey title thereto to the purchaser and after deducting any amount due The Trustee, hereunder, shall disburse the funds received pro rata among the above mentioned loaners in accordance with amount of the loan, including interest, then due them, the balance if any, to be paid to The Battery Company."

By agreement of March 4, 1929, plaintiff Webster was substituted for the Cleveland Trust Company as trustee of the above trust.

The Hazelett Storage Battery Company has at all times held legal title to, and the complete beneficial interest in, the three patents which now form the basis of the suit in which it is plaintiff.

As to the six patents, the beneficial interest was in the five creditors of the Hazelett Storage Battery Company whom the assignment in trust was designed to secure, and in the Hazelett Storage Battery Company.

The Western Battery & Supply Company is a Colorado corporation that has been doing business since March, 1920, at Denver, Colo. Its first connection with the Hazelett Storage Battery Company was through an arrangement made in 1925 by which it was to assemble into batteries at its Denver plant, for distribution through its territory, plates manufactured by the "Hazelett process," by the Hazelett Storage Battery Company, at Cleveland. Early in 1926, however, negotiations were in progress looking toward the Western Company's engaging directly in the manufacture of plates by the Hazelett process, with equipment to be furnished by the Hazelett Storage Battery Company, instead of confining itself, as it had theretofore done, to assembling into batteries plates manufactured by the Hazelett process at Cleveland, or manufactured by itself by hand. The general intent of the negotiations was that Western Company purchase equipment for the manufacture of plates by the Hazelett process, receive a license for such manufacture and be assigned exclusive territory, and pay royalties to Hazelett Storage Battery Company on all plates so manufactured and sold.

At this time one C. V. Chermendy was claiming that he already had a license from Hazelett Storage Battery Company to manufacture plates under the Hazelett process in states west of the Mississippi river. He had some kind of an agreement authorizing him to organize assembly plants for storage batteries, etc., in states west of the Mississippi river using plates manufactured by the Hazelett processes and under the Hazelett patents. The possibility of competition or suit by Chermendy was a much-discussed question throughout the negotiations between Hazelett Storage Battery Company and appellant, as Chermendy and his assignee the Mascot Company continued to claim rights under his alleged contract and to operate thereunder. An agreement was finally arrived at, however, on May 19, 1926, covering what is designated Denver territory. It provided in a general way for the purchase by the defendant of Hazelett plate-making machinery for not to exceed $10,000, payable $2,500 down, $2,500 August 15, 1926, $2,500 September 15, 1926, and the balance on approval of the machinery by appellant, for exclusive right to operate under the Hazelett patents in Denver territory, and royalty of one-half cent per plate for minimum quarterly royalties were to be paid. We set forth certain important provisions thereof:

"It may be terminated at any time by the party of the first part in case of default of

the party of the second part in paying the accrued or minimum royalties aforesaid, except and unless the payment of said royalty is withheld by second party because of the failure of the first party to comply with the covenants and agreements on its part to be kept and performed.

"This agreement may also be terminated by the party of the second part on giving three months' notice to that effect to the party of the first part in which case the prescribed minimum royalty is applied until the end of said three months' period. However, terminated, the party of the second part shall have the right to complete the manufacture of any material on hand provided the prescribed royalty is paid thereon, except as herein above provided in case of breach by first party.

"It is expressly understood, stipulated and agreed that no royalty shall be due first party and payable hereunder during such time as second party may be prevented by conflicting claim of others from exercising the territorial rights and privileges under said patent rights from manufacture or sale in the territory from which said royalties would otherwise be due.

"In case the above conditions obtain and the party of the second part is prevented from exercising the rights and privileges in Denver territory, the party of the first part shall purchase said equipment and all rights under this agreement from the party of the second part within ninety days of notice by party of the second part to party of the first part and pay to the party of the second part, the cost of said equipment delivered to Denver less depreciation at the rate of 10% per annum and payable in cash."

On the same day a similar agreement was drawn up covering the territory in and about Kansas City, Mo., within a given radius, and on this agreement Western Company, on payment of $250, was given a ninety-day option. The option was renewable by Western Company's giving thirty days' notice before the expiration of the ninety-day period and paying $250 for each additional ninety days for which the option should be renewed.

This option agreement for the Kansas City territory, though worded similarly throughout to the agreement covering the Denver territory, did not contain the last two paragraphs of the former agreement. Those two paragraphs, as carried over into a later agreement of August 27, 1926, are of great importance in determining the present controversy.

In the meantime, on May 11, 1926, in order to obtain funds with which to continue operations, and in contemplation of the proposed contract with Western Battery & Supply Company, the directors of Hazelett Storage Battery Company, who were likewise among the beneficiaries of the trust of which the Cleveland Trust Company was trustee, entered into the following arrangement with one H. L. Sherman:

"Providing H. L. Sherman will provide funds up to Ten Thousand Dollars, ($10,-000.00) for the building of equipment for the manufacture of plates by the Hazelett Method, we the undersigned creditors of the Hazelett Storage Battery Company, being holders of notes secured by patents now held in Trust by The Cleveland Trust Company under a Trust agreement dated February 26th, 1923, hereby agree to the issuance of an exclusive license to said Sherman by the Trustee, under all patents and applications for patents. All licenses issued by said Sherman to others shall provide that the royalty shall not be less than $\frac{1}{2}$c for starting and lighting plates and $\frac{1}{4}$c for Radio 'B' battery couples.

"Exclusive territory shall not be granted unless licensee purchases a complete plate making machine and guarantees minimum royalties, and further provided that the exclusive territory shall not extend beyond the point of equal freight rates between cities having a population of Three hundred thousand (300,000) or more at the last Federal Census unless special conditions arise which must be approved by the Board of Directors of the Hazelett Storage Battery Company.

"It is further provided that at any time on ninety days notice the owners of the patents may purchase all rights under this agreement by paying to said Sherman his investment in said equipment, which shall not exceed $20,000.00, plus 33⅓% profit and interest at 6%.

"It is understood that ⅛ of all royalties accruing shall be paid to the Hazelett Storage Battery Co.
"C. W. Hazelett,
"McConnell Shank,
"S. J. Hazelett,
 "By C. W. Hazelett,
 "(Power of Atty)."

It may be said at this point that on May 18, 1926, Samuel J. Hazelett, of St. Louis, executed to his brother, Charles W. Hazelett, a complete power of attorney to deal with his interest as secured creditor under the assignment in trust to the Cleveland Trust

Company, "to execute in my name, any consent or authorization which the said The Cleveland Trust Company and/or the said The Hazelett Storage Battery Company may desire of me as such note-holder, to enable the granting of licenses or permits for the use of the patents so trusteed."

The foregoing arrangement with Sherman was unanimously approved at a meeting of the board of directors of the Hazelett Storage Battery Company on May 18, 1926; the resolution being as follows:

"Resolved: That the arrangement authorizing the issue of a license to H. L. Sherman is hereby unanimously approved by the board, and that The Cleveland Trust Co. be authorized to sign said contract as trustee for the patents under a certain agreement dated Feb. 26, 1923. That in order to expedite said arrangement with Sherman, sufficient money be deposited with the Trustee to pay off those note holders under the Trusteeship who have not signed this agreement in case their consent cannot be obtained."

Thereupon Sherman, in connection with the contract of May 19, 1926, individually gave to Western Battery & Supply Company the following undertaking:

"I, H. L. Sherman hereby agree to issue or cause to be issued to the Western Battery and Supply Co. a license as called for in their contract with the Hazelett Storage Battery Co. dated May 19, 1926, immediately on the issuance of a license to me by the Cleveland Trust Co. per action of the Board of Directors of the Hazelett Storage Battery Co. at their meeting May 18, 1926, and authority issued to the Cleveland Trust Co. following that meeting for the issue of said license.

"I acknowledge herewith receipt of payment as specified in said contract from The Western Battery & Supply Co.

"This is signed by me as Secretary and Director of the Hazelett Storage Battery Co. and as an individual.

"H. L. Sherman.
"Dated May 19, 1926."

In a letter of May 19, 1926, to the Cleveland Trust Company, signed by "The Hazelett Storage Battery Co., C. W. Hazelett, President, H. L. Sherman, Secretary," the following appears:

"We attach herewith certified checks to the amount of $———— as collateral to be deposited with you for the payment of their (Wolf's and Feiss') notes including principal and interest in case their consent is not secured in writing prior to June 1st, 1926.

"By the unanimous consent of the Board of Directors of the Hazelett Storage Battery Company and by the consent of all beneficiaries except as aforesaid, you are authorized to sign a duplicate of the contract with Mr. H. L. Sherman and keep the original signed contract for your files."

And on the same day the Cleveland Trust Company wrote Sherman as follows:

"The license agreement shall be in form approved by The Hazelett Storage Battery Company and by you and shall not be in conflict with a certain consent of certain holders of promissory notes executed by The Hazelett Storage Battery Company, the original of which written consent is on deposit with the Cleveland Trust Company, * * *

"We acknowledge receipt from you of certified checks for an aggregate of $3,500, which we understand is to be held and disbursed by us to the order of George J. Feiss and L. J. Wolf in payment of their promissory notes aggregating $3,000—referred to in said agreement of February 26, 1923."

Wolf and Feiss thus seem to have passed out of the picture. There is a suggestion in the deposition of Shank that C. W. Hazelett and Sherman might have bought their notes. Thenceforth Shank, the two Hazeletts, and Sherman not only made up a majority of the directors and persons interested in the Hazelett Storage Battery Company, but, along with it, represented the entire beneficial interest in the patents held by the Cleveland Trust Company as trustee.

It was not until May 2, 1927, however, that the contemplated license to Sherman was actually issued. This license, after listing Shank and the two Hazeletts as the sole mortgagees of the patents, and reciting the role being played by Sherman, provided:

"That The Cleveland Trust Company, Trustee, hereby grants to said Harland L. Sherman, an exclusive license to manufacture and sell, and to license others to manufacture and sell storage batteries and storage battery plates in accordance with the manufacturing methods, battery structures, parts thereof and machinery for the manufacture of storage battery plates disclosed and claimed in said patents and patent applications subject to the following conditions:

"1. All licenses issued by said Sherman to others shall provide that the royalty shall not be less than $\frac{1}{2}\cancel{c}$ each for plates used or intended for use in automotive starting and lighting batteries and $\frac{1}{4}\cancel{c}$ each for radio B battery couples.

"2. Sherman shall not grant exclusive

territory licenses to others unless such others purchase complete plate making equipment from said Sherman, and unless said licensee or licensees guarantee minimum annual royalty payments.

"3. Any exclusive territory license granted by said Sherman shall not extend beyond the point of equal freight rates between cities having a population of 300,000 or more at the last Federal census, unless special conditions arise whereupon such license may be granted when approved by the Board of Directors of The Hazelett Storage Battery Company.

"4. It is further provided that at any time from the date hereof and within the life of the said patents and/or patents which may hereafter issue, in pursuance of said patent applications and upon ninety (90) days notice to said Sherman, the Hazelett Storage Battery Company and/or its assignees, may purchase all rights from Sherman granted to him by this agreement, by paying to said Sherman his total investment in said equipment, which repayable investment shall not exceed the sum of Fifteen Thousand ($15,-000) dollars, plus 40% profit on the investment and annual interest thereon at the rate of 6%.

"5. Said Sherman hereby agrees to pay to The Hazelett Storage Battery Company, thirty (30) days after the receipt thereof, one twentieth of one cent per plate manufactured and sold under licenses granted by said Sherman to others to The Hazelett Storage Battery Company.

"It is understood by the parties hereto that the present license grant to Harland L. Sherman is made pursuant to the authorization and direction of the equitable holders under said trust agreement approved by the Board of Directors of The Hazelett Storage Battery Company at a special meeting held on May 19, 1926.

"It is understood that The Cleveland Trust Company assumes no responsibility or liability for the genuineness or validity of the patents or patent rights under which this license is granted and makes no warranty as to the legality, validity or genuineness of the patents or patent rights or its title therein."

The authorization referred to in the next to the last paragraph was as follows:

"The foregoing license grant attached hereto has been approved by the Board of Directors of The Hazelett Storage Battery Co., and the equity holders of interests in the patents and patent applications referred to therein, said equitable holders being listed in the Articles of Trust established February 26, 1923, and The Cleveland Trust Company Trustee is accordingly hereby authorized to sign said license agreement for the uses and purposes therein set forth.

"The Hazelett Storage Battery Co.,
 "By C. W. Hazelett, President.
"Attest:
 "H. L. Sherman, Secretary.
 "C. W. Hazelett,
 "McConnell Shank,
 "S. J. Hazelett,
 "By C. W. Hazelett,
 "Power of Atty."

The reason for the Cleveland Trust Company's not being a party to the original agreement of May 19, 1926, or for its delay in executing the license to Sherman, does not clearly appear. Walter E. Bible, president of Western Battery & Supply Company, testified: "The Cleveland Trust Company did not accept a proposition—a contract because they refused to grant us the protection we asked for."

A letter of McCrillis, attorney for the defendant to Hazelett Storage Battery Company, dated April 21, 1926, contains the following passages:

"My personal information in the matter comprehends that The Western Battery and Supply Company recently executed a proposed contract with the Cleveland Trust Company to which the only objection of the latter was that the usual obligation to protect the licensee in its operations under patents and territorial rights is that it might conceivably be obligated to $100,000.

"My client would be willing to limit such obligations to a maximum amount sufficient to reimburse it for expenditures up to such time as its operations might be enjoined because of superior rights in another or others, together with such damages as might be adjudged against my client for its operations under license contract. * * *

"We have no way of knowing in advance what the outcome of this litigation may be but we do know that in the event of taking a contract from you or your associates without guaranty of indemnity we would lose all right of classification as safe and conservative business executives and in the event of Chermendy being successful we would be enjoined from operating under our contract with the result that machinery and equipment costing thousands of dollars would be useless and The Western Battery and Supply

Company would lose, notwithstanding that you and your associates had done all in your power to protect them except to back the courage of your convictions by an indemnity bond or contract against the happening of such a calamity. * * *

"As to the Cleveland Trust Company, we do not know whether in law it holds a naked Trusteeship or a Trusteeship coupled with an interest or whatever the ramifications of its relations to or with others may be.

"Its unwillingness to subscribe to the usual protection clause operating as one of the principal considerations to The Western Battery and Supply Company for its proposed investment is certainly not an inducement for the latter to assume the risk.

"On the other hand, if the position of the Cleveland Trust Company is so neutral and without interest that it would not be expected to assume the responsibility we would not request it, but for the same reasons aforesaid would of necessity require a responsible third party guaranty and would of course prefer that the Cleveland Trust Company pass upon such responsibility and accept it for its own indemnity on its guaranty to us, because it is in a much better position than we are to pass upon such responsibility."

It thus appears that the negotiations leading up to the contract of May 19, 1926, at first contemplated protection of Western Company by an indemnity bond or the personal liability of the licensor, and that to such an undertaking the Cleveland Trust Company was unwilling to become a party.

In the meantime, in June, 1926, the following advertisement appeared in the Denver Post:

"Attention Battery Men

"The Franchise for Assembling Batteries With Plates Made by the 'Hazelett' or Stamping Process Costs absolutely Nothing.

"The Western Battery & Supply Company of Denver, Colorado, hold all exclusive rights in their territory for manufacturing and assembling plates made under and by virtue of said processes and patents, they can furnish you these products now.

"Any other parties representing that they have rights to manufacture storage battery plates by this process or under Hazelett patents in the Denver territory will be liable to prosecution for infringement.

"The Hazelett Storage Battery Company,
"Cleveland, Ohio."

· Also in the meantime, the Hazelett Storage Battery Company's activities as such were discontinued. Its directors ceased to meet, it maintained no office, and after June, 1926, all activities of the sort it had carried on prior thereto were carried on in the name of the Hazelett Manufacturing Company, which seems to have been a partnership composed of C. W. Hazelett and Sherman. A letter of August 17, 1926, written on a letterhead of "The Hazelett Storage Battery Co. Cleveland," but signed by "Hazelett Manufacturing Company, by H. L. Sherman," to Western Battery & Supply Company, notified Western Battery & Supply Company of the change in name to "Hazelett Manufacturing Company, the name under which we are now operating. It was necessary to do this to give us an entirely clean bill of health and is permitting us to establish ourselves in this city. The difficulties encountered were too numerous to endeavor to operate under the old Hazelett Storage Battery Company."

This letter of August 17, 1926, offered to Western Battery & Supply Company a new contract in substitution for the Denver contract and the optional Kansas City contract of May 19, 1926. It stated:

"In preparing the new contract covering Kansas City in accordance with your conversation with Mr. Hazelett, we have simply taken the Kansas City contract and made the following changes to cover both cities, namely Kansas City and Denver.

"You will note that the contract is drawn by and between yourselves and the Hazelett Manufacturing Company, the name under which we are now operating * * * .

"We call your attention to the following changes:

"Paragraph 1. Your new contract is drawn between yourselves and the exclusive licensee instead of the former firm.

"Paragraph 4. The matter of territory has been enlarged to include both Kansas City and Denver, permitting you to operate in both places."

The contract as finally entered into on August 27, 1926, between the Hazelett Manufacturing Company and the Western Battery & Supply, in substitution of the two contracts of May 19, 1926, is so important as to necessitate setting out many provisions thereof. After the usual "whereases" reciting ownership in first party of certain exclusive licenses under the patents and applications for patents, and the desire of second party to acquire exclusive rights to manufacture and sell in certain territory battery plates for batteries under the patents and applications, it provides:

"Now Therefore, the party of the first part in its own right, responsibility and lawful authority in the premises, and in consideration of One Dollar ($1.00) and other good and valuable consideration the receipt whereof is hereby confessed and the further consideration of the mutual covenants and agreements herein contained to be kept and performed by the respective parties hereto, hereby gives and grants to the party of the second part, its successors and assigns, the exclusive right to manufacture and sell storage batteries, plates for storage batteries and parts thereof under the patents and applications for patents aforesaid and any and all improvements thereon, or in relation thereto, for and during the life of this agreement and extensions thereof under the following terms, conditions and mutual obligations:"

The exclusive territory is then set out, and this follows:

"The party of the second in consideration of the covenants and agreements of the first party, on its part, promises and agrees:

"To purchase machinery and equipment for the manufacture of plates in Kansas City, Mo., under said patents, and applications for letters patent, from the party of the first part at a price f. o. b. Cleveland, Ohio, of not to exceed Eleven thousand dollars ($11,000.00), in accordance with bill of equipment hereto attached, marked Exhibit B and hereby made a part hereof by reference.

"Party of the first part hereby acknowledges receipt from party of the second part of The three thousand dollars ($3,000.00) in cash, and two notes of Twenty-five hundred dollars ($2500.00) each, maturing August 15th, 1926 and September 15th, 1926, as part payment on this machine.

"Party of the second part agrees to pay party of the first part Three thousand dollars ($3,000.00) in addition on the shipment of the equipment mentioned herein.

"As part of the consideration for said license, the party of the second part will pay to the party of the first part, a royalty of one-half cent ($\frac{1}{2}\cancel{c}$) for each individual plate passing inspection and manufactured by second party under said patents or any of them, of a size for installation in a battery, except plates for Radio "B" batteries on which the royalty shall be one-quarter cent ($\frac{1}{4}\cancel{c}$) per couple; the said royalty shall be payable on the 20th day of each month and cover the entire number of plates manufactured during the preceding month or any part thereof.

"If said royalty after six months from the complete installation of an approved machine for the manufacture of said plates does not amount to Eighteen hundred and twenty-five dollars ($1825.00) per quarter, the party of the first part shall have the option of terminating this license provided, however, that the party of the second part may preserve the license from quarter to quarter by paying a sufficient amount in addition to the accrued royalty of one-half cent ($\frac{1}{2}\cancel{c}$) per plate and one-quarter cent ($\frac{1}{4}\cancel{c}$) per couple, as will make the total paid that quarter Eighteen hundred and twenty-five dollars ($1825.00) * * *

"This agreement, unless otherwise terminated, shall run for the life of said patents and each thereof.

"It may be terminated at any time by the party of the first part in case of default of the party of the second part in paying the accrued or minimum royalties aforesaid, except and unless the payment of said royalty is withheld by second party because of the failure of the first party to comply with the covenants and agreements on its part to be kept and performed.

"This agreement may also be terminated by the party of the second part on giving three months' notice to that effect to the party of the first part in which case the prescribed minimum royalty is applied until the end of said three months' period. * * *

"It is expressly understood, stipulated and agreed that no royalty shall be due first party and payable hereunder during such time as second party may be prevented by conflicting claim of others from exercising the territorial rights and privileges under said patent rights from manufacture or sale in the territory from which said royalties would otherwise be due.

"In case the above conditions obtain and the party of the second part is prevented from exercising the rights and privileges in its territory, the party of the first part shall purchase said equipment and all rights under this agreement from the party of the second part within ninety days of notice by party of the second part to party of the first part and pay to party of the second part, the cost of said equipment delivered, less depreciation, at the rate of 10% per annum and payable in cash.

"This agreement cancels all previous agreements of the party of the second part, pertaining to licenses under said patents and applications for patents."

It is to be noted that the concluding **two**

paragraphs of the Denver agreement of May 19, 1926, but which were omitted from the Kansas City agreement of May 19, 1926, were thus carried over verbatim into the agreement of August 27, 1926, covering both the Denver and Kansas City territories.

Because of the Chermendy matter, already alluded to, these two paragraphs soon caused disagreement which continued down to the time of the present suits. Both prior to and after the agreement of August 27, 1926, Western Battery & Supply Company was continually urging upon Hazelett Manufacturing Company the seriousness of Chermendy's competition, and urging that suit be brought against Chermendy. Many letters to this effect appear in the record.

Hazelett Manufacturing Company, on the other hand, not only minimized Chermendy's efforts, but demanded its royalties under the contract of August 27, 1926. By letter of December 3, 1926, signed by "Hazelett Manufacturing Company, C. W. Hazelett," to appellant, it was suggested that the contract of August 27, 1926, be changed by eliminating the language excusing the nonpayment of royalty, to wit, "except and unless payment of said royalty is withheld by second party because of the failure of the first party to comply with the covenants and agreements on its part to be kept and performed," and by substituting therefor the following: "Party of the first part agrees to use due diligence in protecting party of the second part from conflicting claims or infringements on said patents in the territory allotted and such damage as may be incurred by party of the second part from such conflicting claims or infringements shall be rebated in proportion to the damage done you by such infringement, the amount of such damage to be arrived at by mutual agreement if possible, and if not, by arbitration in the customary manner."

This suggestion was renewed in a letter of December 18, 1926, signed by "Hazelett Manufacturing Company, C. W. Hazelett."

As late as October, 1929, a conference was held at Kansas City, Mo., the main purpose of which seems to have been to get Western Battery & Supply Company to sign another contract, minus the protection provisions, in substitution for the contract of August 27, 1926. This was not accomplished.

A letter of February 5, 1927, from "Hazelett Manufacturing Company, By H. L. Sherman," informed Western Battery & Supply Company of Hazelett Manufacturing Company's intention shortly to file suit for the purpose of enjoining Chermendy.

A letter from Western Battery & Supply Company to Hazelett Manufacturing Company, dated June 23, 1927, informed the latter that a Mr. Curtis, Denver attorney, had "stated that the main point now is to complete the chain of license from the Hazelett Storage Battery Company and the Cleveland Trust Company to the Western Battery and Supply Company. This he stated would be a very simple matter as it would only be necessary for Sherman to license the Hazelett Manufacturing Company, but the date of the license of course should be prior to the date of our contract."

These further steps, however, appear never to have been taken.

A letter of November 16, 1929, signed "Hazelett Manufacturing Co. H. L. Sherman," informed Western Battery and Supply Company that, "Inasmuch as you have not paid even the minimum royalty required by the agreement of August 27, 1926, we hereby notify you that that agreement is cancelled and terminated."

On March 13, 1929, the Hazelett Storage Battery Company revived sufficiently to join with Webster as trustee and Sherman in a suit filed in the District Court of the United States for the District of Colorado against Chermendy and the Mascot Battery Manufacturing Company, a corporation through which Chermendy was operating, charging infringement of the nine patents involved in the present suits. The suit against Chermendy, however, has never yet gone to final hearing.

Chermendy stopped manufacture voluntarily on May 12, 1930, and on June 30, 1930, Western Battery & Supply Company sent Hazelett Manufacturing Company a check for $953, as payment of minimum royalty from the time Chermendy quit to July 1, 1930. This check was returned by Hazelett Manufacturing Company, under date of July 14, 1930, without comment.

Further facts will be brought out in dealing with the issues essential to their determination.

Was the license agreement of August 27, 1926, binding on plaintiffs?

The trial court found that at the time of filing the bills in each of the cases the defendant had no license from the plaintiffs or from any one authorized giving authority to manufacture or sell machinery embodying the Hazelett inventions. If this conclusion is correct, it is determinative of these cases. We therefore give it first consideration.

Plaintiffs point out in their brief that the agreement of August 27, 1926, which, we have seen, superseded the two prior agreements of May 19, 1926, "is not by appellees, or by either of them, or by any predecessor of appellees, or of either of them, but is by one Hazelett Manufacturing Company, apparently a partnership composed of the inventor Hazelett and one Harlan L. Sherman."

We are at some loss to understand, in view of this record, how plaintiffs can profess to be such complete strangers to, and to have so little knowledge of, "one Hazelett Manufacturing Company" and "one Harlan L. Sherman," when for some years past, with the knowledge and consent of a majority, if not all, of the directors and persons beneficially interested in the Hazelett Storage Battery Company, and of all the persons beneficially interested in the trust which Webster represents, it has been as the Hazelett Manufacturing Company that the Hazelett Storage Battery Company has been operating. It is noticeable that neither of the Hazeletts nor Sherman shed any light on the situation by going on the stand and testifying.

We consider first the position of the plaintiff Hazelett Storage Battery Company with regard to the three patents involved in its suit.

At all times it has held both the legal title and the complete beneficial interest in these patents. By valid contract of May 18, 1926, it agreed to license defendant to use them in what was termed Denver territory; and on the same day it gave to defendant an option on a license agreement for their use in Kansas City territory.

On May 19, 1926, and ever since, C. W. Hazelett, S. J. Hazelett, and McConnell Shank have at all times comprised a majority of Hazelett Storage Battery Company's board of directors. H. L. Sherman likewise became a director soon after his entrance into that company's affairs. Hazelett and Sherman constituted the Hazelett Manufacturing Company. The board of directors of the Hazelett Storage Company ceased to meet from June, 1926, on.

In this state of affairs the new contract of August 27, 1926, in substitution for the two contracts with the Hazelett Storage Battery Company of May 19, 1926, heretofore referred to, was made with the Hazelett Manufacturing Company, as the name under which the Hazelett Storage Battery Company was then operating.

Shank was a director of the Hazelett Stor-age Battery Company, and knew, in general, what was being done. He testified: "I don't think I ever saw the contract at that time and didn't know a great deal about the details except that this contract was to comply with the arrangement the Hazelett Storage Battery Co. had with Sherman." He testified further: "The license to Western was never approved by me under any circumstances so far as I recall except that I knew that such an arrangement was being made and if I had made any objections I presume it might have been listened to."

S. J. Hazelett had given complete power of attorney in the matter to his brother, C. W. Hazelett, who, with Sherman, were the ones who directly carried through the negotiations for the substituted contract with defendant. Under these circumstances it is not difficult to find ratification, if not prior authorization, by the Hazelett Storage Battery Company of what was done in the name of the Hazelett Manufacturing Company.

For the performance of their usual functions, the board of directors of a corporation must act as a body, at a meeting. Nevertheless it is generally held that the ratification of acts done on behalf of the corporation may be made very informally, by a majority of the directors individually.

In 14a Corpus Juris, at page 382, it is said: "Except where the ratification is required to be made in a particular manner, it may be implied from the acquiescence in, or recognition of, the act by the corporation, through its proper officer or agent, or from its accepting and retaining the benefits of the act, or from any other acts or conduct which reasonably tend to show an intention to adopt or affirm the act or contract, particularly where it appears that the corporation has repeatedly recognized and approved similar acts done by the officer or agent, and provided that at the time of such acts or conduct it has full knowledge of the material facts; and where the unauthorized act or contract is clearly beneficial to the corporation, a ratification may be implied from slight circumstances."

In that the contract with defendant was most aggressively sought after by the officers of Hazelett Storage Battery Company as a means of enlarging its business and obtaining resulting revenue, it can hardly be said that it was not beneficial to the Hazelett Storage Battery Company. That it did not become beneficial because of a failure to perform all the covenants incumbent upon the licensor to perform is immaterial in this connection.

In 7 Ruling Case Law, at pages 664, 665, it is said: "The assent or approval of a corporation to acts done on its account, may be inferred in the same manner that the assent of a natural person may be, and it is well settled that where a corporation with full knowledge of the unauthorized act of its officers or agents acquiesces in and consents to such acts, it thereby ratifies them, especially where the acquiescence results in prejudice to a third person." And at page 655 of the same volume of Ruling Case Law it is said: "Knowledge of the board of directors, which has the general management of the corporate affairs, is of course imported to the corporation."

In Harris v. Moreland Truck Co. (C. C. A.) 279 F. 543, the court laid emphasis upon the fact that the owners of the beneficial interest in the corporation had agreed to the contract in question. The same would certainly seem to be true in the instant case; likewise the case in which Webster is plaintiff, hereinafter discussed.

In Kentucky Coal Lands Co. v. Mineral Development Co. (C. C. A.) 295 F. 255, the court held that where a party was the owner of all the stock in a corporation except qualifying shares for directors, he was in the contemplation of the parties the same as the company.

█ In exactly the same sense, and with similar results, the Hazelett Manufacturing Company, C. W. Hazelett, and Sherman, in the instant case, were in the contemplation of every one the same as the Hazelett Storage Battery Company.

On the question of ratification, see Vose v. Roebuck Weather-Strip & Wire Screen Co. (D. C.) 216 F. 523; Taylor Gas Producer Co. v. Wood (C. C.) 119 F. 966, affirmed (C. C. A.) 125 F. 337.

The cases are many in which the corporate fiction is disregarded as between parent and subsidiary corporations or between corporate affiliates.

In 7 Ruling Case Law, at page 27, it is pointed out that: "Where it (a corporation) is proceeding in equity to assert rights of an equitable nature, or is seeking relief on rules or principles of equity, a court of equity will not forget that the stockholders are the real and substantial beneficiaries of a recovery, and if the stockholders have no standing in equity, and are not equitably entitled to the remedy sought to be enforced by the corporation in their behalf, the corporation will not be permitted to recover."

For the above statement the author cites Home Fire Ins. Co. v. Barber, 67 Neb. 644, 93 N. W. 1024, 60 L. R. A. 927, 108 Am. St. Rep. 716, wherein the opinion was written by Roscoe Pound, then Commissioner of the Supreme Court of Nebraska, now Dean of the Harvard Law School. In the course of the opinion, at pages 1031–1033 of 93 N. W., Dean Pound used the following language:

"Conceding, then, that all of the present stockholders are so circumstanced that no relief should be afforded them in a court of equity, may the corporation recover, notwithstanding? We think not. Where a corporation is not asserting or endeavoring to protect a title to property, it can only maintain a suit in equity as the representative of its stockholders. If they have no standing in equity to entitle them to the relief sought for their benefit, they cannot obtain such relief through the corporation or in its own name. [Citing cases.] It would be a reproach to courts of equity if this were not so. If a court of equity could not look behind the corporation to the shareholders, who are the real and substantial beneficiaries, and ascertain whether these ultimate beneficiaries of the relief it is asked to grant have any standing to demand it, the maxim that equity looks to the substance, and not the form, would be very much limited in its application. * * *

"To permit persons to recover through the medium of a court of equity that to which they are not entitled, simply because the nominal recovery is by a distinct person through whom they receive the whole actual and substantial benefit, and that nominal person would, in ordinary cases, as representing beneficiaries having a right to recover, be entitled to relief, is perversion of equity. * * * When the corporation comes into equity and seeks equitable relief, we ought to look at the substance of the proceeding, and, if the beneficiaries of the judgment sought have no standing in equity to recover, we ought not to become befogged by the fiction of corporate individuality, and apply the principles of equity to reach an inequitable result."

The underlying principle in the cases is the same, viz., that the corporate fiction, being a tool of the law, will not be allowed to be pushed to the extent of furthering injustice rather than justice.

█ In the instant case, the Hazelett Manufacturing Company and the Hazelett Storage Battery Company were a single business entity, and the latter company was bound by the contract entered into in its behalf by

the Hazelett Manufacturing Company. The common control and management of the two companies may well estop the Hazelett Storage Battery Company from denying the authority of the Hazelett Manufacturing Company in the premises, which latter company was nothing more than an instrumentality of the Hazelett Storage Battery Company.

It woud be a perversion of equity to allow the Hazelett Storage Battery Company to recover for the benefit of Sherman, C. W. Hazelett, S. J. Hazelett, and Shank, for the infringement of patent rights, the use of which was expressly granted to defendant by license agreement with said Sherman and C. W. Hazelett, as the Hazelett Manufacturing Company, in which agreement said S. J. Hazelett and Shank entirely concurred.

The suit in which Webster is plaintiff is more complicated.

With regard to the six patents there involved, legal title at the time of the license agreement of August 27, 1926, was not in the Hazelett Storage Battery Company, but in Webster's predecessor, the Cleveland Trust Company. The complete beneficial interest, however, was at that time in C. W. Hazelett, S. J. Hazelett, Shank, and possibly Sherman, as creditors of the Hazelett Storage Battery Company, and in the Hazelett Storage Battery Company. The latter's beneficial interest, however, in turn redounded to the benefit of the said C. W. Hazelett, S. J. Hazelett, Shank, and Sherman.

■ The trusteeship was not coupled with an interest, and the duties of the Cleveland Trust Company, under the trust agreement of February 26, 1923, were solely to hold legal title to the patents and reassign them to the Hazelett Storage Battery when the notes they secured were paid, or, if said notes were not paid, then, at the request of the noteholders, to sell the patents at private or public sale. The noteholders never made the contemplated request that they be sold. Instead they entered into the license contract with defendant. While the license to Sherman from the trust company was not executed until May 2, 1927, it recites that it was "made pursuant to the authorization and direction of the equitable holders under said trust agreement approved by the Board of Directors of The Hazelett Storage Battery Company at a special meeting held on May 19, 1926." It undoubtedly related back to May 19, 1926. The license, C. W. Hazelett's power of attorney, and approval were filed in the Patent Office.

■ Considering the nature of the trust, the sole beneficiaries thereof could have put an end to it at any time. Eakle v. Ingram, 142 Cal. 15, 75 P. 566, 100 Am. St. Rep. 99, stands for the proposition that, as stated in the second syllabus, "A trustee without interest in the trust, except a claim for services on continuance of the trust, has no standing in court to dispute the application of all the beneficiaries for a dissolution of the trust." At pages 566, 567 of 75 P. the court said: "The judgment, we think, is right. The plaintiffs are the only persons beneficially interested in the property * * *; and in such cases the rule is as stated by Mr. Underhill: 'If there is only one beneficiary, or if there are several and they are all of one mind, and he or they are not under any disability, the specific performance of the trust may be arrested, and the trust modified or extinguished.' Underhill on Trusts & Trustees, pp. 370–375, 13. * * *" Citing also 2 Perry on Trusts, § 920; 1 Perry on Trusts, § 104; Lewin on Trusts, 684, 685; Tiffany & Bullard Law of Trusts & Trustees, 815, 816. See, also, Sears v. Choate, 146 Mass. 395, 15 N. E. 786, 4 Am. St. Rep. 320; Sands v. Old Colony Trust Co., 195 Mass. 575, 81 N. E. 300, 12 Ann. Cas. 837; Anderson v. Williams, 262 Ill. 308, 104 N. E. 659, 661, Ann. Cas. 1915B, 720.

In Chemical Foundation, Inc., v. E. I. Du Pont de Nemours & Co. (D. C.) 29 F.(2d) 597, at page 601, the rule as to who may grant a license under a patent is thus broadly stated: "A true license can be granted only by one who owns or has an interest in the property affected by the license."

And one who has transferred a patent by way of pledge, as distinguished from mortgage, though for exactly the same purpose, has been held not to have thereby disabled himself completely from dealing with the patent, as by himself bringing suit for infringement. Westmoreland Specialty Co. v. Hogan (C. C. A.) 167 F. 327.

■ In the light of the above propositions, it would seem that the interest of the beneficiaries of a trust of the nature here involved approaches so nearly to complete ownership, with all the incidents thereof, as to justify the conclusion that a license agreement entered into by all the beneficiaries may bind the trustee. In all events, the acts of the beneficiaries may estop the trustee from recovering on their (the beneficiaries') behalf, on exactly the same principle on which the stockholders of a corporation have been held to be able to estop the corporation from recovering on their (the stockholders') behalf.

In Home Fire Ins. Co. v. Barber, supra, the court said: "This principle that in equity the corporation is regarded as a trustee for those who are the ultimate substantial beneficiaries of what is held and acquired in the corporate name finds many important illustrations in various departments of the law of corporations."

If the trustee relation of a corporation to its stockholders is a reason for allowing action of the stockholders to estop the corporation from recovering on the stockholders' behalf, it would certainly follow that a real trustee may be estopped from recovering on behalf of his cestuis que trustent by the action of the cestuis que trustent.

Most real party in 'interest statutes specifically except from their operation the trustee of an express trust, but the rule in such a situation is thus stated in 39 Cyclopedia of Law and Procedure, at page 449: "In a suit by a trustee under a statute allowing him to sue without joining his beneficiaries, any defense may be made which might have been made had the beneficiaries been joined."

The same evidence which was used to show the equitable position of plaintiff Hazelett Storage Battery Company likewise shows the equitable position of plaintiff Webster. For it shows that all the beneficiaries of Webster's trust, were the suit by them, would be estopped from denying the sufficiency of the license agreement of August 27, 1926. And on the reasoning heretofore advanced their estoppel works also as an estoppel of their trustee from recovering in their behalf.

Plaintiffs point out at page 16 of their brief that the authorization by the directors of Hazelett Storage Battery Company to the Cleveland Trust Company and to Sherman, for the issuance of licenses under the patents, embodied the requirements that "every sub-licensee was to pay, not under certain conditions, but under all conditions (Clause 1); every sub-licensee holding an exclusive territory, as appellant claims, was to pay a minimum not under certain conditions, but under all conditions (Clause 2); and no sub-license was to be granted for more than one territory (Clause 3)."

But even assuming that the above constituted express limitations imposed by the directors of Hazelett Storage Battery Company, which is doubtful, such limitations could nevertheless be abrogated and dispensed with by the same directors who originally provided them. And this appears from the evidence to have been done. Except in so far

as it was unwilling to become personally bound for indemnity, the Cleveland Trust Company seems to have been at all times ready and willing to do whatever the directors of Hazelett Storage Battery should ask of it in the matter. It is thus immaterial that the license contract of August 27, 1926, may possibly have gone further than the license by the Cleveland Trust Company, when actually issued on May 2, 1927, seems to have gone.

We can reach no other conclusion than that the license of August 27, 1926, is valid and binding as to both appellees and that they are estopped to question its validity.

We pass to the question of nonpayment of royalty under the contract as a basis of cancellation. There was no attempt to cancel the license until November 16, 1929, when notice was given by the Hazelett Manufacturing Company to defendant that the agreement of August 27, 1926, was canceled for failure to pay royalty as required by the contract.

Under the Denver contract of May 19, 1926, and the contract of August 27, 1926, covering both Denver and Kansas City, which superseded it, the obligation of Western Battery & Supply Company to pay royalty was absolute, except in so far as the same was excused by nonperformance by Hazelett Manufacturing Company of its own covenants and agreements. The right of cancellation is dependent upon the failure to pay royalties under the terms of the license, and this raises the question as to what the terms of the license were in this regard. The royalty provisions thereof have been heretofore set forth. The important and controlling provision, which is called in argument the protection provision, we here restate: "It is expressly understood, stipulated and agreed that no royalty shall be due first party and payable hereunder during such time as second party may be prevented by conflicting claim of others from exercising the territorial rights and privileges under said patent rights from manufacture or sale in the territory from which said royalties would otherwise be due." This provision is the defense against payment of royalties, which otherwise it is conceded would be payable.

The trial court in its findings of fact, discussing this protection provision, says:

"Does that clause mean, as defendant contends it does, that the defendant is licensed freely to sell articles embodying plaintiff's patents without paying royalties whenever and during all the time that some unauthor-

ized infringer to any extent may be competing in defendant's territory? Or does it mean, as is urged by plaintiff, only that the defendant is excused from paying royalties or the stipulated minimum of $1850 per quarter in the event and while it is prevented as by injunction from operating under its license in its territory?

"Of these two suggested constructions the last is the right one."

The court refers to the next provision heretofore set forth as making clear its construction of the protection clause, saying: "Clearly the theory of this provision is that if the licensee has been prevented, that is, stopped from selling articles embodying the patents in its territory as by an injunction it will be placed in a status quo ante by having returned to it its original investment, less depreciation. The intent expressed is that the licensee will give notice that it has been prevented from exercising its rights and privileges, whereupon the licensor must repurchase the equipment sold to the licensee. The provision is entirely inconsistent with the construction given the protection provision by the defendant, that the defendant, if met with any competition by an infringer, may nevertheless continue to operate under the license, decline to give the notice which would compel the licen. or to put it in status quo; and be excused from any further payment of royalties, whatever might be the extent of its operations under and profits by reason of the patents."

The trial court placed much emphasis on the word "prevented."

 Defendant's theory, referred to by the court, is that the protective clause covers substantial competition by infringers within the. exclusively protected .territory. To give it the construction which the learned trial court gave it seems to us would make it a redundant provision, for an injunction against the exercise by defendant of its rights and privileges under the license could have been obtained only because of either the invalidity of the patents or the invalidity of the license; and in either case defendant's obligations under the license would have fallen with its rights. Such a construction of the protection clause would destroy its vitality, and is therefore to be avoided if possible. There is a very reasonable presumption in the law that parties do not intend the doing of useless acts. The license is an exclusive one and therefore the protection clauses contained therein are construed with some liberality. It was the grant of an exclusive privilege to use the patents, improvements, etc., in a particularly described territory—"covered and protected by this agreement." The exclusiveness is of the very essence of the agreement. It is the chief purpose of the usual protection clause. In Rosenthal Paper Co. v. National Folding Box & Paper Co., 226 N. Y. 313, 123 N. E. 766, 768, there was, as in the instant cases, an exclusive license, a provision for royalty of so much per article sold, and a provision for a specified minimum royalty. There was no provision such as there is in the agreement here involved, that no royalty should be due in case the protection clause should not be lived up to. In a suit for royalty the court used language that might be used to describe the purpose of the protection clause involved in the instant suits, as follows: "In the contract under consideration the intention of the parties is not obscure. They contemplated that the letters patent prohibited to all persons except Seligstein, in the absence of his authorization, the manufacture and sale or the manufacture or sale of any box incorporating the patented invention or inventions and that the contract secured to the defendant the exclusive right, as against the whole world, to manufacture and sell, within the prescribed territory, the box. This exclusive right the defendant sought and Seligstein sold to it. The continued exclusiveness of the right throughout the period of five years was the root of the transaction. The defendant, presumably, could not, in the intention of the parties, pay Seligstein for the right to manufacture and sell a product which others, without price, were manufacturing and selling. It was essential to the purpose of the contract that the protection to and the exclusiveness of the right sold the defendant should be coexistent or concurrent with its ownership of it, and they were so created."

In Wilfley v. New Standard Concentrator Co. (C. C. A.) 164 F. 421, the suit was for accrued royalty, and the protection clause, though not quoted in the opinion, was thus summarized at page 422: "The plaintiffs in error further covenanted at their own expense and cost to take all necessary and reasonable steps to protect the claims of the Wilfley patent, and the rights of the defendants in error thereto, by virtue of the license so granted, and to prosecute infringers thereof." The clause was thus similar to the one which Hazelett Manufacturing Company sought by letter of December 3, 1926, to have substituted for the one disentitling it to the

right to terminate the contract for nonpayment of royalty in case its own covenants and agreements were not performed.

Yet from such a clause the court in the Wilfley Case held the same result to follow that the Hazelett Manufacturing Company thus sought to avoid. The court said, pages 423, 424 of 164 F.: "The license here purported to be an exclusive one. Its very exclusiveness was the substance of the thing granted. It was of the essence of that for which the defendants in error agreed to pay royalties."

█ Since the territorial rights and privileges conferred upon defendant by the contract of August 27, 1926, were expressly stipulated, in other parts of the contract, to be exclusive, it is not taking undue liberties with the protection clause to interpret it as though the word exclusive were expressly contained therein.

█ While the meaning of the words, "during such time as second party may be prevented by conflicting claim of others from exercising the territorial rights and privileges under said patent rights from manufacture or sale in the territory from which said royalties would otherwise be due," is debatable, they are at least sufficiently ambiguous to admit of evidence showing the intention of the parties in writing this clause into the contract; and there is in the record abundant evidence unobjected to showing such intention.

In a letter of February 13, 1926, to defendant, signed by "The Hazelett Storage Battery Sales Co., C. W. Hazelett," it was stated that:

"We will do everything possible to prosecute any competition that might develop from Mr. Chermendy and we are taking steps at the present moment to have the Better Business Bureau quash his plans. We are also having Dun and Bradstreets check up any individuals who are in any way connected with his operations.

"We certainly desire to do our part in giving you protection and we respectfully ask the question 'How About Some Business?'"

In a letter of March 27, 1926, to defendant, signed

"The Hazelett Storage Battery Co.
"C. W. Hazelett, President,"

it was stated: "We, of course, agree to do everything within our power to protect you against infringement and to use if necessary, all royalties accruing in your territory, for the purpose of said protection." This letter also assured defendant that Chermendy was a "long, long ways" from getting into actual production.

A letter of April 21, 1926, signed
"The Hazelett Storage Battery Co.
"C. W. Hazelett,"

dealt with both the possibility of suit by Chermendy and the possibility of competition by Chermendy. Regarding the possibility of suit, it said: "Let us assume the worst possible conditions if you have this machinery and license. Chermendy could sue you on what grounds? You would only have to appear in court once to show that we are the parties to be sued if anyone. You have a machine and a license furnished by us and even Chermendy's contract which he showed us as his consideration in organizing his company is nonexclusive. If he construes it as such for any reason, we are then at fault for issuing another license and are subject to his suit because of this. Any suit against you is bound to be thrown out of court on the first hearing under these conditions."

Turning to the possibility of competition, it said:

"You will see from the above that under the worst conditions, you have equipment upon which you do not have to pay any royalty and with which you can beat all competition and you have the least possible reasons for worry regarding a suit.

"Now contrast this with our position. We have furnished you a machine on which we may not be able to collect any royalty if Chermendy produces. We have made no profit. That is to say we have nothing except much better grounds for law suit by Chermendy than you have. We certainly expect to fight Chermendy with all of the weapons at our command in order to collect royalty from you and protect ourselves from depredations in other territory.

"In view of the fact we are giving you everything the situation offers and getting nothing definite in return unless you are protected, we feel that our entire proposition to you is entitled to prompt acceptance."

The letter of April 21, 1926, shows beyond all doubt that at that time the Hazelett people were taking the aggressive in bringing the proposed contract to consummation, and that as an inducement thereto they held out to defendant in the plainest of terms the protection which defendant now insists it was given by the contract.

In a letter by the Hazelett people to Mc-

Grillis, attorney for defendant, dated April 28, 1926, and signed,

"The Hazelett Storage Battery Co.,
"C. W. Hazelett, President,"

it was stated:

"We have told Western Battery & Supply Company recently that the offer we have made them gives us no profit either on the equipment or in the license in case they are molested by, or even face the competition of the Mascot Company. They get the machinery and a legal title to the same and the right to operate it given by the owner of the patents and we get nothing whatever except an excellent opportunity for a suit by the Mascot Battery against us for damages for violating their alleged rights.

"It will be obvious to you that we are placed in a position where we must do all in our power to destroy their competition as it might be disastrous for us in other territory."

Lee B. Long, treasurer of defendant, testified: "The substance of our conversation at the time we were negotiating for this contract of May 19, was that we must have protection against infringement because we knew that this infringement existed at that time and was growing in our territory and we had been corresponding with them prior to the signing of this contract. The substance of our conversation was that we were to have protection by non-payment of royalties as long as infringement existed in our territory; that in the event we were enjoined we would have the privilege, on notice to them, of returning the machinery to them, they to pay us for the machinery in cash—pay our money back in cash."

Walter E. Bible, president of defendant, likewise testified: "I don't remember the exact conversation. I remember the substance of the conversation was that we had to be protected against infringement and also being put out of business or enjoined from operating. The substance of the conversation was that in case of an infringement that we were not to pay any royalty; in case of an injunction or if we were stopped from operating, we were to demand that they purchase back the machinery and they were to pay us the money back in cash upon certain notice."

Helen Lichtenberg, stenographer in the employ of Hazelett Storage Battery Company, and later of Hazelett Manufacturing Company, testified by deposition, on cross-examination, that the conversations she remembered referred to by Long and Bible related only to protection against defendant being stopped by Chermendy. She was asked: "Did they insist that something be incorporated in the contract to give them protection against being stopped by Mr. Chermendy." Over objection she was allowed to answer: "Yes. As near as I can remember it, the Mr. Bibles or Mr. Long in the negotiations leading up to the contract of August, 1926, wanted a protection clause against— they wanted protection against being stopped by Mr. Chermendy."

She was asked: "Did Mr. Hazelett and Mr. Sherman, prior to the time this contract was signed, say they would give them such a clause in the contract?" Over objection she was allowed to answer: "Yes. They said they would give them protection against Chermendy—against being stopped by Chermendy. I don't recall anything being said along the line of protection against competition by Chermendy."

This testimony, going only as it does to absence of recollection, does not conflict with the positive testimony of Long and Bible or with the many expressions of their understanding in the matter contained in the correspondence of the parties, as set forth above. Long and Bible are probably wrong in their belief that the clause providing for nonpayment of royalty covered the contingency of competition, and the immediately succeeding repurchase clause the contingency of being stopped, since the repurchase clause starts out with the words, "In case the above conditions obtain." They no doubt both deal with the same contingency, but it would seem that contingency embraces both the event of the competition by an infringer and the event of defendant's being stopped by injunction. In the latter event, defendant's only alternative would, of course, be to require immediate repurchase; but in the event of competition by an infringer, it was to have a choice between requiring immediate repurchase, and continuing manufacture under the patents, but without royalty being required until the competition should cease.

This we think is the import of the agreement, in light of the fact that it was an exclusive license that was being granted, and in light of the many expressions of their understanding made by the parties in course of the negotiations out of which the agreement resulted.

In its letter of December 18, 1926, the Hazelett Manufacturing Company showed that it still retained this understanding of the agreement when it said, " * * * we

recognize the fact that we are entitled to our royalty as long as you are substantially free from infringers and to no royalty in case infringement went on uncurbed." Whether the operations of Chermendy constituted such substantial competition as to bring into operation the clause now being merely construed, is a question yet to be determined.

Plaintiffs complain that the construction contended for by defendant amounts in effect to defendant's being given a free license. But this all depends on whether plaintiffs themselves live up to their own covenants; and the protection clause was designed to insure their so doing. That this was the clear understanding of the Hazelett Storage Battery Company is shown by its letter of April 21, 1926, wherein it said: "We certainly expect to fight Chermendy with all of the weapons at our command in order to collect royalty from you and protect ourselves from depredations in other territory."

We are satisfied that under the terms of the license agreement of August 27, 1926, the Hazelett Manufacturing Company could not cancel the contract so long as Chermendy and Mascot Company were guilty of substantial infringing competition within the exclusive territory covered by the license. Such we think is the proper interpretation of the protection clause.

■ Appellees' contention is that even with this construction of the protecting clause, appellant is still in default because the existence of infringement has not been shown, so the next question is as to whether there was substantial infringing competition by Chermendy or the Mascot Company.

Did the facts justify nonpayment of royalty?

In its findings of fact the District Court said: "And even if any such a construction should be given the protection clause as that contended for by the defendant, if it is possible that the licensor intended to excuse the licensee from all royalty payments if it encountered in its territory any competition, however small, on the part of an infringer, it is certainly incumbent on the defendant to show that what was sold in competition with it did embody the patents covered by the license. It would be absurd to suggest that the licensor intended to excuse the licensee from the payment of royalties if another sold or offered for sale in its territory products which were designed for the same uses but which did not embody the patents covered by the license."

This is true. But what degree of proof as to infringement is required?

Plaintiffs at page 26 of their brief claim: "The question of infringement is a question for determination by the Court, from a comparison of the claims of the patents with that which is alleged to infringe; it is not a subject for testimony, not even for the testimony of an expert, but must be shown by showing to the Court the patents alleged to be infringed, and that which is alleged to infringe, so that the Court, from these facts, can draw the conclusion." If this is correct the protection clause of the license agreement could have been brought into operation only by the successful termination of a suit by plaintiffs against Chermendy, and in that event there would have been no need of it. It may be assumed it was to guard against the possibility that plaintiffs might be dilatory in prosecuting infringement by Chermendy, which was recognized all along to exist, that the protection clause was inserted in the first place.

We refer to some of the record showing we think clearly infringing competition.

Batteries manufactured respectively by defendant and Chermendy's Company, the Mascot Battery Manufacturing Company, were in evidence. Witness Thomas testified that the two batteries were the same except for a lug at the bottom of defendant's battery which the Mascot Battery did not have. He also testified that the Mascot Company operated under a contract with the Hazelett Storage Battery Company for the manufacture of plates in states west of the Mississippi river.

W. E. Bible testified that plates for the Mascot Battery were made by the same process.

The suit filed in the District Court of the United States for the District of Colorado, on March 13, 1929, by "The Hazelett Storage Battery Company, a Corporation, Gordan A. Webster, as trustee, and Harland L. Sherman, Plaintiffs," against "The Mascot Battery Manufacturing Company, a corporation, and C. V. Chermendy, Defendants," was based upon the alleged infringement of the same letters patent as those covered by the license agreement with defendant and now involved in the instant suits. The answer of Chermendy admitted "the manufacture of batteries, making use of plates in accordance with the Hazelett processes and under the Hazelett patents," and as a defense relied entirely upon a license agreement of Janu-

ary 9, 1925, with the Hazelett Storage Battery Company, which it was alleged had never been validly rescinded.

The above case has not yet gone to final hearing. But a decision on the merits would determine either that Chermendy was an infringer, or that his license was valid, and in either event his competition would be brought within the scope of the protection clause of defendant's license agreement of August 27, 1926.

Furthermore, the above pleadings present exactly the same kind of proof of infringement by Chermendy as that upon which the District Court in the present suits is asked to decree infringement against defendant. While these pleadings are found in the exhibits offered in support of petition for rehearing, the condensed statement of the evidence as approved by the court contains them. In any event, the evidence shows the fact of such suit being brought.

Except for the alternative that Chermendy's contract of January 9, 1925, was still valid and unrescinded, the conclusion is inescapable from the evidence that Chermendy was an infringer; and the alternative as much as the fact of infringement would be sufficient to bring the protection clause of defendant's contract into operation. For even the authorized manufacture by Chermendy would necessarily deny to defendant the exclusive territory it bargained for.

Of course the infringing competition must be substantial—not trivial. That it was substantial, there can be no doubt. Witness Thomas, secretary of the Mascot Company, testified: "They had a building fifty feet wide, one hundred twenty-five feet deep, two stories. At one time during 1928 we had thirty-five employees. They fluctuated. In 1929 we had around twelve employees steadily. The batteries which we manufactured were sold in the territory of Colorado, Texas, Utah, Wyoming, some in Kansas, that is the western part of Kansas, and the western part of Nebraska. * * * Our sales in 1926 were $29,000; 1927 the sales were $77,000; 1928 our sales were $105,000; and 1929 our sales were $151,000; that is approximately."

Defendant was continually complaining to Hazelett Storage Battery Company or Hazelett Manufacturing Company of the way in which Chermendy was underselling it, taking away its customers, and reducing its sales. Many such letters are presented in the record, and the Hazelett Storage Battery Company or Hazelett Manufacturing Company throughout the correspondence claimed that Chermendy or Mascot Company was infringing. Both Hazelett and Sherman told Shank that they thought Chermendy was making batteries under the Hazelett process.

The conclusion follows that there was very clearly extensive competition by Chermendy up to May 1, 1930, in the territory covered by the license, whether authorized or unauthorized, of such a substantial character as to bring into operation the protection clause of the contract of August 27, 1926, thus both justifying defendant in the withholding of royalties during that time and disentitling the plaintiffs or the Hazelett Manufacturing Company to exercise the right of terminating the contract on notice, which right said company thus ineffectively attempted to exercise by letter of November 16, 1929.

Plaintiffs and defendant both argue that the equities of the situation are with them. As to this we may say that the defendant seems to have invested some $35,000 in the establishment of its Kansas City plant, on the faith of the grant of a license to it to operate under the Hazelett patents, and to have paid some $11,000 to the Hazelett people for a machine built solely for the manufacture of battery plates under the Hazelett patents and probably worthless otherwise. The decrees of the District Court would result not only in defendant's losing the greater part of its investment, but also in its having to account, as an infringer, thus losing the benefit of all the labor and expense involved in several years of operation not merely with the consent, but at the instigation, of the very persons who would profit from this suit.

On the other hand, plaintiffs contend that defendant has made large profits in its operation under these patents and has tendered in royalty less than $1,000.00. This is true, but this has been no hardship except that expressly undertaken as an inducement to defendant to adhere to the arrangement that plaintiffs held out to it. And that hardship has not been unavoidable; it has been due solely to plaintiffs' failure to live up to their own covenants. Under such circumstances plaintiffs are not in good position to complain of whatever profits defendant may have made in the course of its operations under the Hazelett patents.

It is our conclusion after careful consideration of this case that appellees are bound by the license agreement of August 27, 1926, that appellant was justified in refusing to pay royalties up to the time when the infringing competition of Chermendy and the Mas-

cot Company ceased, and that there was no basis for the attempted cancellation of the license. We are not passing on the question of the recovery of royalties. Plaintiffs have an adequate remedy at law to test the question of the amount due as royalties. This action is based on alleged infringement, not on breach of the contract. The decree in each of the cases is reversed, and they are remanded with instructions to dismiss the bills at the costs of appellees.

Reversed and remanded.